UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

VIRGINIA ELECTRIC AND POWER
COMPANY, d/b/a DOMINION VIRGINIA
POWER,

Plaintiff,

v.

Action No. 3:14-CV-538

BRANSEN ENERGY, INC., f/k/a
BRANSEN ENERGY, LLC,

Defendant.

### MEMORANDUM OPINION

THIS MATTER is before the Court on a Motion for Partial Summary Judgment On Its First Amended Complaint and Summary Judgment on Defendant's Amended Counterclaim ("Dominion's Motion") filed by Plaintiff Virginia Electric and Power Company, d/b/a Dominion Virginia Power ("Dominion"), ECF No. 28, and a Motion for Partial Summary Judgment ("Bransen's Motion") filed by Defendant Bransen Energy, Inc., ("Bransen"), ECF No. 33.  For the reasons stated below, the Court will GRANT Dominion's Motion, ECF No. 28, and, accordingly, DENY Bransen's Motion, ECF No. 33.

## I.    PROCEDURAL BACKGROUND

On September 10, 2014, Dominion filed an Amended Complaint, alleging that Bransen breached several, written contracts by failing to perform its contractual obligations relating to the delivery and servicing of coal.  ECF No. 15.  In its Amended Complaint, Dominion seeks relief in the amount of $1,957,325.00, which encompasses the amount Bransen invoiced Dominion for the coke breeze and the $14,000.00 in direct damages for applications fees stemming from the presence of coke breeze in the fuel.  On September 22, 2014, Bransen filed an amended counterclaim against Dominion.  ECF No. 16.

On March 16, 2015, Dominion moved for partial summary judgment on its Amended Complaint and summary judgment on Bransen's amended counterclaim.  ECF. No. 28.

Subsequently, on the same day, Bransen moved for partial summary judgment.  ECF No. 33.  On March 27, 2015, Dominion filed its opposition to Bransen's Motion.  ECF No. 39.  Likewise, on the same day, Bransen filed its sealed response to Dominon's Motion.  ECF No. 40.  On April 2, 2015, Bransen filed its reply, ECF No. 41, as did Dominion, ECF No. 43.

## II.   FACTUAL BACKGROUND

### A.   The Master Coal Purchase and Sale Agreement ("the Master Agreement")

Dominion needed fuels for use during a process known as "performance testing" at its newly constructed Virginia City Hybrid Energy Center ("VCHEC") before that plant's scheduled commissioning in July of 2012—*i.e.*, its Commercial Operations Date ("COD").  Obtaining a certain kind of fuel for pre-COD use was vital to Dominion's ability to properly test VCHEC's boilers and other equipment as part of the commissioning process.  Dominion was required to adhere to strict parameters in regard to the coal product it could burn as part of the performance testing phase of the VCHEC commissioning process.  For example, it had to obtain and comply with environmental permits issued by the Virginia Department of Environmental Quality ("DEQ"), prescribing the type of coal product that could be burned at VCHEC during performance testing. Further, Dominion was required to burn only performance fuel meeting specific quality specifications during performance testing to keep its equipment warranties intact at VCHEC.

On November 8, 2010, Dominion and Bransen (collectively, the "Parties") executed a Master Coal Purchase and Sale Agreement ("the Master Agreement") for the purchase of coal. The Master Agreement governed any "Transactions" into which the Parties subsequently entered, as detailed in written "Confirmations," which were expressly integrated into the Master Agreement.  The subject of the Master Agreement was specifically defined as "Coal" whose "quality . . . conforms to the Specifications" and does not trigger Dominion's rejection rights or is otherwise accepted by Dominion and that, among other criteria, "is substantially free from any extraneous materials." ECF No. 29 (Ex. 1. ("Master Agreement") at Art. 10) (defining

"Coal").   "Specifications" referred to "the quality characteristics for the Coal subject to a Transaction . . . as specified in . . . the relevant Confirmation."   *Id.* (defining "Specifications"). Upon executing the Master Agreement, Bransen made a number of representations and warranties ("R&Ws") to Dominion.  So, too, did Dominion to Bransen.  In particular, the Parties represented and warranted:

> [n]o event of Default or Potential Event of Default with respect to it has occurred and is continuing and no such event or circumstances would occur as a result of its entering into or performing its obligations under this Master Agreement and each Transaction.

*Id.* § 1.3(g).   Under the terms of the Master Agreement, these R&Ws were continuing and deemed repeated for each Transaction into which the Parties subsequently entered.  *Id.*

B. <u>The Pre-COD Confirmation, the Land Lease Agreement, and the Coal Services Agreement</u>

Three agreements were executed by the Parties on January 26, 2011.  First, the Parties entered into a Confirmation for performance fuel[1] (the "Pre-COD Confirmation"), under which Dominion expressly assumed "an obligation to purchase a minimum of 450,000 Tons" of "Run-of-Mine Coal" subject to particular specifications, with an option to purchase 150,000 tons more.   ECF No. 29 (Ex. 5 ("Pre-COD Confirmation")) (explaining the specifications of the "Product" and "Contract Quantity").    The Pre-COD Confirmation expressly recognized Dominion's unique needs and limitations at VCHEC, including the "stringent environmental limits" pertaining to the coal product it could burn.   *Id.* (explaining certain limitations under which VCHEC could operate).   The Pre-COD Confirmation obligated Bransen to obtain prior written approval from Dominion for delivery of any material from sources not included on a specific list.   *Id.*   (listing the "Sources" that would not require Bransen to obtain Dominion's prior authorization).

---

[1] Bransen says that "[n]owhere within the Agreements does the term 'performance fuel' appear." ECF No. 40 ¶ 4.   Bransen is incorrect.   The Pre-COD specifications are expressly designated "PERFORMANCE FUEL SPECIFICATIONS." *See* ECF No. 29 (Ex. 5 ("Pre-COD Confirmation")).

Second, the Parties entered into a Coal Services Agreement (the "Services Agreement") under which Bransen was required to provide numerous services. *Id.* (Ex. 9 ("Services Agreement") at Preamble, § 1(a)-(c), (e)). Bransen warranted to Dominion that "the Services will be performed in a safe, professional and workmanlike manner," "in strict accordance" with the Services Agreement and the other contracts between the Parties, and "in accordance with generally acceptable professional industry standards." *Id.* § 18. Bransen subsequently delegated some of the required services to another entity, Coal Technology International, LLC ("CTI"), including the obligation of "[m]aintain[ing] the integrity of any and all piles in which the Coal may be stored," which Bransen supervised and directed. *See id.* (Ex. 10 ("Subcontracting Agreement") at § 2(b)); *see, e.g., id.* (Ex. 11 ("Mullins Dep.") 34:4-20)). The Parties agreed that Dominion could test any "ready pile" prepared by Bransen, *see id.* (Ex. 5 ("Pre-COD Confirmation")), and reject any ready pile that failed to meet specifications or was otherwise "unsuitable for use" at VCHEC, *see id.* (Ex. 9 ("Services Agreement")). According to Sections eight (8) and nine (9) of the Services Agreement, Dominion was not obligated to pay for any services unless and until Bransen fully and properly performed them all. *Id.* (Ex. 9 ("Services Agreement")).

Third, as part of this transaction, Dominion entered into a Land Lease Agreement (the "Lease Agreement") with CTI for the purpose of leasing property (the "Leased Property") on which the product that Bransen delivered would be stockpiled and managed before later delivery to VCHEC. *Id.* (Ex. 6 ("Lease Agreement") at Preamble, Recitals A, C). The Lease Agreement was expressly interrelated with the agreements between Bransen and Dominion. Dominion and CTI therefore agreed that the Lease Agreement would automatically terminate upon the expiration or termination of any pending Confirmations and the Services Agreement.[2]  *Id.* § 2.

---

[2] It is for this reason that Dominion argues that it did not issue a formal, written notice of default to Bransen for many, many months after confirming the stockpiles contained coke breeze because Dominion feared that it would be deemed to have "abandoned" the product for which it had already paid. Once Dominion terminated one contract, all the others, in turn, would be terminated, and Dominion would be left in a bind regarding securing product to meet. Dominion's argument that it

In addition, the Lease Agreement provided that any product remaining on the stockpile following the post-termination removal period would be deemed "abandoned."  *Id.* § 8.

### C.  The Two Post-COD Confirmations

On October 19, 2011, after Bransen had been delivering the product to the Leased Property for nearly one year, the Parties executed two more Confirmations ("the Post-COD Confirmations") for the purchase by Dominion and sale by Bransen of up to three (3) million tons of "Waste Coal," with each confirmation having different quality specifications and price, through December 31, 2015. [3]  Each of the Post-COD Confirmations states that Dominion "shall submit a weekly order to Seller."  ECF No. 34 (Exs. 8-9 ("Post-COD Confirmations")).

### D.  Termination and Limitation-of-Liability Provisions

The Master Agreement provides that "[u]pon the occurrence and during the continuation of an Event of Default," the non-defaulting party may terminate the Master Agreement and all Transactions.  ECF No. 29 (Ex. 1. ("Master Agreement") § 8.2).  As relevant, an "Event[] of Default" occurs if a party fails "to comply with any material obligation under a Transaction" where "such failure continues uncured for three (3) Business Days after written notice thereof" or if any R&W "shall prove to be untrue or misleading in any material respect when made or when deemed made or repeated," with no cure period provided.  *Id.* § 8.1(ii), (iv).  In relevant part, specifically, Section 8.1 of the Master Agreement provides that an event of default shall mean any of the following:

> (ii) the failure of the Defaulting Party to comply with any material obligation under a Transaction covered by this Master Agreement (except to the extent constituting a separate Event of Default and except for such Party's obligations to deliver or receive Coal, the exclusive remedy for which is provided in Section 8.4 and except for Seller's obligations to deliver Coal pursuant to the Specifications contained in a Confirmation, the exclusive remedy for which is provided in Sections 5.1, 5.2 and 5.3)

proceeded to mitigate damages by (1) continuing to negotiate with Bransen for a resolution and (2) incurring $14,000.00 of damages in application fees to amend its Virginia Department of Environmental Quality ("DEQ") permits to enable the post-COD attempted processing of coal material mixed with coke breeze at VCHEC is persuasive.

[3] The Parties dispute the minimum-purchase requirement, or lack thereof, in the Post-COD Confirmations.

and such failure continues uncured for three (3) Business Days after written notice thereof;

(iv) any representation or warranty made by a Party herein shall prove to be untrue or misleading in any material respect when made or when deemed made or repeated.

*Id.* In the event of termination, the Master Agreement establishes a detailed procedure by which the non-defaulting Party shall calculate an amount, called a "Termination Payment," for each terminated Transaction. *Id.* § 8.3(a), (b). The Termination Payment "shall be due . . . within two (2) Business Days" of the defaulting party's "receipt of an invoice." *Id.* § 8.3(c). If the defaulting party disputes the calculation, it must—again within two business days—provide "a detailed written explanation" and performance assurance "in an amount equal to the Termination Payment." *Id.*

The Services Agreement likewise provides for termination by the non-defaulting party "[u]pon the occurrence and continuance of an Event of Default." "Events of Default" are defined to include, as relevant here, "the failure of the Defaulting Party to comply with any material obligation under this Agreement and such failure continues uncured for thirty (30) calendar days after written notice thereof." *Id.* (Ex. 9 ("Services Agreement") § 11(b)).

As to the limitation of liability provisions, the Master Agreement additionally contains a provision that limits liability—where a remedy or measure of damages is not expressly provided—to "DIRECT ACTUAL DAMAGES ONLY." ECF No. 29 (Ex. 1. ("Master Agreement") § 8.8). Specifically, except for "out-of-pocket expenses, including Legal Costs, incurred by the Non-Defaulting Party by reason of the enforcement and protection of its rights," *id.* § 8.7 "NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, OR INDIRECT DAMAGES, LOST PROFITS, OR OTHER BUSINESS INTERRUPTION DAMAGES." The Services Agreement contains a nearly identical provision.

E.   Performance Under the Contracts

6

Commencing in January and February of 2011, Bransen delivered a product to the Leased Property.  During 2011, Bransen sent Dominion invoices totaling at least $26,724,750.17 for delivering to the Leased Property just above 599,920 tons of a product described in shipping summaries as "COAL."[4]  *See* ECF No. 29 (Ex. 13 ("Bransen Invoices to Dominion")).  Without disclosing the material to be coke breeze, labelling the product as "COAL," Bransen included the total tonnage of coke breeze in invoices submitted to Dominion for payment.  *Id.* (Ex. 15 ("Bransen Dep.") 32:18-33:1, 34:18-22, 36:8-15,39:6-10).  Evidence demonstrates that Dominion paid these invoices in full.  *See e.g.*, *id.* (Ex. 14 ("Bransen BB&T Statements")).  In mid-December 2011, Dominion received an anonymous tip indicating that Bransen had delivered substantial quantities of "coke breeze" to the Leased Property, had taken deliberate steps to hide the coke breeze from Dominion, and had participated with Dominion personnel in millions of dollars of kickbacks at the CTI site.  ECF No. 40 (Ex. 12 ("Tipster Letter")).  As a result of this letter, Dominion began investigating whether these allegations were true.

Prior to Dominion receiving the anonymous tip and prior to Bransen commencing shipments of Run-of-Mine Coal, Bransen chose to use a product called "coke breeze" and obtained approximately 43,000 tons, which was then laid down under approximately 60% of the Coal Stockpile at the Leased Property.  ECF No, 40 at 9; *see also* ECF No. 29 (Ex. 18 ("Peters Interview")).  Bransen delivered at least 43,000 tons of coke breeze to the Leased Property between February and April 2011.  *Id.*  The coke breeze product can be used as fuel in circulating fluidized bed plants and is substantially more porous than other potential products in that it can provide a base layer resulting in substantially better drainage and with much less loss of stockpile during storage.  ECF No. 29 (Ex. 18 ("Peters Interview")).  Dominion was prohibited from processing coke breeze—or any product containing coke breeze—at VCHEC under the

---

[4] This amounts to a weighted-average payment of $44.54 per ton (rounding down to the nearest fill cent).  Reply Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment on Its First Amended Complaint and Summary Judgment on Defendant's Amended Counterclaim ("ECF No. 43") at 1.

terms of the DEQ permits that were in place at the time.  ECF No. 29 at 7-8.  Nevertheless, Bransen had begun negotiating to acquire the coke breeze for delivery to the Leased Property no later than early January 2011, weeks before the Parties executed the Pre-COD Confirmation on January 26, 2011.  ECF No 29 (Ex. 15 "Bransen's Request for Admissions Responses") at No. 4. Furthermore, Bransen purchased the coke breeze with the expectation that it was, in fact, coke breeze—as opposed to some other product, including coal.  *Id.* at No. 65.

Following Dominion's receipt of the tipster letter, on February 15, 2012, Bransen's owner and president, Michael Peters ("Peters"), participated in an interview with Dominion personnel. ECF No. 29 (Ex. 18 ("Peters Interview")).  During the interview, he acknowledged having delivered at least 43,000 tons of coke breeze to the stockpile on the Leased Property during the first few months of 2011—shortly after the execution of the Pre-COD Confirmation, but many months before the Post-COD Confirmations were executed.  *Id.*  Peters signed a summary of this interview and verified that the statements therein were "accurate" and "true and correct to the best of [his] knowledge."  *Id.*  Peters stated that the coke breeze had been put down on at least sixty percent of the stockpile, expressed "embarrass[ment]" for what he had done, "accept[ed] full responsibility for having improperly charged Dominion for the coke breeze," conceded that "[h]e did not request nor receive permission from Dominion to purchase and bill Dominion for the purchase of the coke breeze under the terms of the agreement," and stated that "[n]o one from Dominion came to the [Leased Property]" during the time when the coke breeze was being delivered.  *Id.*

      F.  Events After The Early 2012 Confirmation of the Delivery of Coke Breeze

Upon confirming in early 2012 that Bransen had delivered coke breeze, Dominion arranged for independent, third-party laboratory analyses of all ready piles that Bransen prepared.  ECF No. 29.  In other words, Dominion tested three ready piles for delivery for the presence or absence of coke breeze.  These analyses revealed the presence of coke breeze; as

such, none were ever delivered to VCHEC . *Id.* (Ex. 15("Bransen Dep.") 40:19-41:6).  Bransen never identified any method of separating the coke breeze from the coal.  *See id.* ¶ 24.

G.  Events of Default and Termination

Over the course of 2012, a Dominion decision at the executive level was made that Dominion would do no further business with Bransen.[5]  Bransen concededly became aware that the relationship between the Parties was a "real uphill battle" and failing as of early 2012.  The parties attempted to reach an amicable resolution for over two years.  On June 22, 2013, during this time of negotiations to come to a resolution between counsel for Dominion and Bransen, Dominion issued to Bransen a cease and desist letter demanding that Bransen not reenter the Leased Property Dominion claims it reserved all rights to terminate the contracts between the Parties if settlement negotiations failed.  At various points, Bransen offered to replace or buy back some or all of the product on the stockpile, subject to multiple contingencies and conditions.  ECF No. 29 at 12; ECF No. 40 at 25-26.  Dominion declined these proposals as commercially infeasible.  *Id.*  In a letter dated June 15, 2014, Bransen made a demand that Dominion perform.

Dominion, via a July 21, 2014 letter, formally declared the occurrence of Events of Default and material breaches under the Master Agreement, the Pre-COD Confirmation, the Post-COD Confirmations, and the Services Agreement on July 21, 2014, pursuant to the default and notice requirements under Sections 8.1 and 9.3 of the Master Agreement, and Sections 11 and 30 of the Services Agreement.  ECF No. 29 (Ex. 24 ("Letter from Dominion to Bransen")).  To recall, the Master Agreement provides that "[u]pon the occurrence and during the continuation of an Event of Default," the non-defaulting Party may terminate the Master

---

[5] Bransen claims it was never informed of this decision.  ECF No. 40 at 13, 18.  Dominion claims, "Over the course of 2012, Dominion informed Bransen that Bransen's coke-breeze-related misconduct had irreparably damaged their relationship."  ECF No. 29 at 12 (citing Workman Decl. ¶ 9; Ex. 15 ("Bransen Dep.") 58:9-59:12).  Further, Dominion claims it indicated that" it would not submit any orders under the Post-COD Confirmations, and Bransen concededly became aware that the relationship between the Parties was a 'real uphill battle' and failing as of early 2012."  *Id.*  (citing Ex. 15 ("Bransen Dep.") 58:9-59:12; *id.* at 99:4-11.)

Agreement and all Transactions.  As relevant, an "Event[] of Default" occurs if a Party fails "to comply with any material obligation under a Transaction" where "such failure continues uncured for three (3) Business Days after written notice thereof" or if any R&W "shall prove to be untrue or misleading in any material respect when made or when deemed made or repeated," with no cure period provided.  As such, after three (3) business days had elapsed with no response by Bransen to Dominion's July 21, 2014 notice of default, Dominion formally terminated the Master Agreement, the Pre-COD Confirmation, and the Post-COD Confirmations on July 25, 2014.  ECF No. 29 (Ex. 25 ("Second July Letter from Dominion to Bransen")).  In that notice, Dominion also requested a Termination Payment.

The Services Agreement likewise provides for termination by the non-defaulting Party "[u]pon the occurrence and continuance of an Event of Default."  "Events of Default" are defined to include, as relevant here, "the failure of the Defaulting Party to comply with any material obligation under this Agreement and such failure continues uncured for thirty (30) calendar days after written notice thereof."  After Bransen did not cure any breaches under the Services Agreement[6] within thirty (30) calendar days after Dominion's notice of default dated July 21, 2014, Dominion, by written notice dated September 5, 2014, formally terminated the Services Agreement.  *Id.* (Ex 26 ("September Letter from Dominion to Bransen")).

Subsequently, Dominion amended its DEQ permits to enable the eventual (*i.e.*, post-COD) attempted processing of coal material mixed with coke breeze at VCHEC.  Bisha Decl. ¶¶

---

[6] Bransen admits that it received correspondence from Dominion dated July 25, 2014 but argues that it was not afforded access by Dominion to the stockpile.  Dominion asserts that Bransen's material breaches under the Services Agreement were not curable by their nature, given Bransen's fraudulent and deceptive conduct and the widespread presence of coke breeze in a stockpile containing hundreds of thousands of tons of material.  Nevertheless, and without waiving any rights, Dominion further argues that it allowed Bransen three (3) days, under the Master Agreement, and more than thirty (30) calendar days, consistent with Section 11 of the Services Agreement, to attempt to cure its material breaches and that Bransen failed to do so.  Bransen denies any such brazen behavior and disputes the aforementioned assertions by Dominion, arguing the following:  (1) Dominion refused Bransen any opportunity to cure—*i.e.* replace the 600,000 tons—and (2) replaced CTI as the operator on the Lease Property as of June 1, 2013.  Bransen , specifically, argues that  the current operator is Harold Keene Surface Co., LLC and the current controller is Omega Holdings, LLC—both of which assumed operator and controller status on June 1, 2013.  Accordingly, Dominion having replaced CTI as the Controller, Bransen argues it was an impossible for Bransen or its subcontractor, CTI, to reenter the Leased Property to commence performance under the Service Agreement.

9-10 (attaching proof of payment of $14,000.00 in application fees).  To complete the VCHEC commissioning process without delay, Dominion purchased additional coal product from alternative sources.  Baughan Decl. ¶ 13.

## III.   LEGAL STANDARD

When considering cross-motions for summary judgment, the Court applies the same standard as that applied to individual motions.  *Rossignol v.* Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  Although the facts must be viewed in the light most favorable to the non-moving party, *Anderson v. Liberty Lobby*, 477 U.S. 252, 255 (1984), where a motion has been properly supported, the non-moving party has the burden of showing that a genuine dispute exists, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The "mere existence of *some* alleged factual dispute between the Parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247-48 (emphases in original).  The non-moving party must "rely on more than conclusory allegations, mere speculation, the building of one inference upon another, the mere existence of a scintilla of evidence, or the appearance of some metaphysical doubt concerning a material fact."  *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (internal quotation marks omitted).

## IV.   PARTIES' ARGUMENTS

### a.   Dominion's Motion for Partial Summary Judgment

For primarily two reasons,[7] Dominion alleges that there is no genuine issue of material fact as to Bransen's liability for the unauthorized and improper delivery of at least 43,631 tons of coke breeze.

---

[7] Dominion includes a brief argument that Bransen violated the implied duty of good faith, defined in the UCC as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade," Va. Code Ann. § 8.2-103(1)(b), by intentionally engaging in misdeeds and misrepresentations—*i.e.,* by deliberately blending and concealing the coke breeze, presenting

First, Dominion argues that Bransen materially breached the substantive obligations of the: (1) Master Agreement; (2) Pre-COD Confirmation; and (3) Services Agreement by delivering coke breeze to the Leased Property and then deliberately concealing it from Dominion. "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997). In particular, Dominion claims that, under the Master Agreement and the Pre-COD Confirmation, Bransen's obligations included:

a. delivering Run-of-Mine Coal to the Leased Property in the quantity requested by Dominion, and meeting the specifications set forth in the Pre-COD Confirmation;
b. obtaining Dominion's prior written approval before delivering any material originating from a source other than one authorized in the Pre-COD Confirmation;
c. providing Dominion with accurate origin sampling data;
d. providing Dominion with accurate product information on its shipping notices and invoices; and
e. fulfilling its implied duty of good faith and fair dealing by conducting itself with honesty and sincerity, and without deceit, in carrying out its obligations owed to Dominion.

Say Dominion, "the essential purpose of the Parties' agreements was the procurement and maintenance of a specific quantity (600,000 tons) of a specific product (Run-of-Mine Coal) at a specific time (pre-COD) and for a specific function (pre-COD performance testing at VCHEC). *See* ECF No. 43 at 14 (citing Ex. 2 ("Nov. 30, 2010 Bransen Energy, LLC Term Sheet")) (term sheet signed by Peters stating in "Term" section that "[d]eliveries of Performance Fuel to VCHEC would be made as requested by [Dominion] in order to support testing of the generating unit and supporting equipment, and potentially through initial commercial operations of the plant")); ECF No. 29 (Ex. 7 ("Sutherland Dep.") 26:16-27:10) (stating, as a Bransen employee, that Peters or his stepfather mentioned that the Parties' initial agreements concerned product "specifically for use as part of the performance testing process to get [VCHECH] commissioned"). Yet Bransen concedes that between February and April 2011, it delivered to the Leased Property an enormous quantity of coke breeze from a non-approved source, which it

Dominion with misleading documentation, and refusing to acknowledge the presence of coke breeze until pressed during a subsequent investigation.

represented and billed to Dominion as 'COAL.'"   Therefore, Dominion argues that Bransen materially breached each of these obligations by delivering a minimum of 43,000 tons of coke breeze to the Leased Property in early 2011.[8]   Critically, Dominion persuasively argues that coke breeze is not coal at all—let alone "Run-of-Mine Coal."   Dominion asserts that coke breeze was never acceptable since Dominion could not process coke breeze at VCHEC under the terms of its DEQ permits then in place.   In sum, Dominion argues that Bransen's breaches were all material because they went to the very essence of the Parties' agreement and defeated the essential purpose of the parties' agreement—*i.e.*, the delivery and purchase of the performance fuel Dominion needed, when Dominion needed it, and for its intended use as an integral part of the VCHEC commissioning process.

Second, Dominion asserts that Bransen also made representations and warranties to Dominion in connection with the execution of the Master Agreement, which Bransen repeated in subsequent transactions.   Dominion argues that Bransen breached multiple R&Ws for several reasons.   Indeed, Bransen made a continuing R&W in the Master Agreement (and under the

---

[8] Dominion specifically argues that Bransen materially breached each of the contracts no later than the following:

- The Master Agreement: upon executing the Pre-COD Confirmation on January 26, 2011, when Bransen was deemed to have made and repeated the materially untrue and misleading R&W that no default had occurred or would occur, given that Bransen had already begun negotiating for the delivery of coke breeze to the Leased Property—or, at the very least, when Bransen first began improperly delivering coke breeze to the Leased Property in February 2011 and billing Dominion for the same;

- The Pre-COD Confirmation: same;

- The Services Agreement: upon execution on January 26, 2011, when Bransen warranted that all services would be performed "in strict accordance" with the contracts between the Parties, as well as "in accordance with generally acceptable professional industry standards" (SA § 18)—or, at the very least, when Bransen accepted delivery of coke breeze and began deliberately intermingling it with the other product on the stockpile between February and April 2011, such that the stockpile was not managed and handled so that the product ultimately transported to VCHEC would meet the required specifications (*id.* § 1(b)); and

- The Post-COD Confirmations: upon execution on October 19, 2011, when Bransen was deemed to have made and repeated the materially untrue and misleading R&W that no default had occurred or would occur, given that Bransen had already breached the Master Agreement and Pre-COD Confirmations for the reasons described above.

ECF No. 29. at 22.

terms of the Master Agreement, in the Pre-COD and Post-COD) that no default "ha[d] occurred" or "would occur" in the course of its performance.  Similarly, Bransen warranted that all services would be performed "in strict accordance" with the Services Agreement and the Parties' other contracts, as well as "in accordance with generally acceptable professional industry standards." Dominion argues that Bransen begun negotiating to purchase coke breeze for delivery to the Leased Property no later than early January 2011, several weeks before executing the Pre-COD Confirmation on January 26, 2011.  Dominion underscores that Bransen had already made arrangements to breach the contracts before it entered into a single confirmation.  Dominion argues there is thus no genuine issue of material fact that Bransen made and repeated a materially "untrue or misleading" R&W—and thereby precipitated an "Event of Default" as defined in the Master Agreement—in connection with (1) executing the Pre-COD Confirmation, (2) delivering and billing Dominion for an enormous quantity of coke breeze mischaracterized as "COAL," and (3) executing the Post-COD Confirmations.  Likewise, Dominion asserts there is no genuine issue of material fact that Bransen's false warranty under the Services Agreement constituted a "failure . . . to comply with a[] material obligation under [the Services Agreement]" that "continue[d] uncured for thirty (30) calendar days after written notice thereof"—and thereby precipitated an "Event of Default" as defined therein.

Next, Dominion argues that there is no genuine issue of material fact as to the direct damages to which Dominion is entitled for Bransen's coke-breeze-related breaches.  In total, Dominion seeks direct damages in the amount of $1,957,325.00.

Finally, as for any contention that Dominion improperly rejected Bransen's attempts to replace the entire stockpile, or any further cure efforts, Dominion argues that no material fact suggests that its conduct in this regard was anything but commercially reasonable.  Dominion argues that Bransen's purported replacement offers came far too late to serve the original purpose of the Parties' contracts, and they all involved unacceptable contingencies or

contemplated a continuing business relationship between the Parties, thus effectively rendering the offers meaningless.

In response, Bransen first argues that "coke breeze had the quality characteristics consistent with the quality specifications set forth in the Pre-COD Confirmation."  ECF No. 40 at 9 (citing Exs. 8, 26) (setting forth the coke breeze average quality specifications).  According to Bransen, "using coke breeze as a base layer is not an attempt to hide it."  *Id.* at 9.  Additionally, Bransen argues that Dominion demanded that Bransen act illegally.  Bransen argues that any efforts to start performing under the contracts were impeded by Dominion's issuance of a cease and desist letter, which Bransen argues demanded it no longer access the coal on the Leased Property for any reason.  ECF No. 40 at 19.  Subsequently, Bransen was placed upon a three day cure period.  *Id.*  Therefore, Bransen essentially argues that it was stuck—that is, Bransen argues that it could not have possibly cured any alleged defaults—or rather, accessed the Leased Property should it wished to have cured the defects—because Dominion simultaneously refused Bransen access.  *Id.*  Therefore, Bransen argues compliance was impossible.  Likewise, after receiving the demand notice by Dominion regarding the Services Agreement and requirement to cure within thirty days or face termination, Bransen argues that it was impossible for it to perform.  *Id.*

On similar note, Bransen argues that, because Dominion entered into a service agreement with Omega Holdings, a third-party, in June of 2013, see *id.* at 19 (citing (Ex. 16 "Omega Service Agreement")), Dominion knew or should have known that demanding Bransen to reenter the Leased Property, pursuant to Dominion's July 21, 2014 notice letter, consitututed illegal acts on behalf of Bransen.

As to any assertions that it breached any R&Ws by delivering coke breeze, Bransen flatly disagrees with Dominion.  Bransen argues that the opposite is in fact true pursuant to the plain language of the Master Agreement.  For support, Bransen turns to section 9.2 of the Master

Agreement to bolster its argument that it "excluded" any such R&Ws claimed to have been breached.  Section 9.2 expressly provides the following:

> OTHER THAN THOSE EXPRESSLY PROVIDED HEREIN OR IN A CONFIRMATION SELLER MAKES NO OTHER REPRESENTATION OR WARRANTY, WRITTEN OR ORAL, EXPRESS OR IMPLIED, IN CONNECTION WITH THE SALE AND PURCHASE OF COAL HEREUNDER. ALL WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE OR ARISING FROM A COURSE OF DEALING OR USAGE OF TRADE ARE SPECIFICALLY EXCLUDED. SELLER MAKES NO WARRANTY CONCERNING THE SUITABILITY OF COAL DELIVERED HEREUNDER FOR USE IN ANY FACILITIES.[9]

ECF No. 40 at 21 (citing Ex. 4) § 9.2).  Bransen contends that it "specifically and in all capital letters" excluded such warranties and specifically excluded any warranty for a particular purpose and suitability for use in any facilities within the Master Agreement.  Alternatively, Bransen argues that Dominion accepted the product it delivered and failed to revoke.  Bransen claims that only after three non-conforming shipments and seller failing to provide acceptable assurances does Dominion have the right to declare an Early Termination Date and Event of Default."  *Id.* § 5.3.  In sum, therefore, Bransen argues that Dominion does not demonstrate the required, aforementioned condition precedents to exercising any early termination rights or event of default.  Similarly, Bransen argues that Dominion has not denied that it continues to use the product delivered to it.  Therefore, even if non-conforming, Bransen underscores that Dominion cannot recover under any contract since it continues to utilize the product.  Finally,

---

[9] Based on this language, Bransen's proffered assertions that, in the Master Agreement, it specifically made no warranty to Dominion concerning the suitability of coal delivered for use in any facilities and that it disclaimed all R&Ws are wrong for a few reasons.  Bransen ignores the language stating, "OTHER THAN THOSE EXPRESSLY PROVIDED HEREIN OR IN A CONFIRMATION . . . ." ECF No. 40 at 21 (citing Ex. 4) § 9.2)).  The R&Ws that Dominon claims Bransen breached *are* expressly enumerated in the Master Agreement as are the warranties in the Services Agreement.

As Dominion correctly sets forth, "[th]at Bransen's coke-breeze-related conduct rendered its product unsuitable for use as performance fuel at VCHEC does not negate the fact that the same conduct also violated Bransen's express promises—to wit, that '[n]o Event of Default or Potential Event of Default . . . ha[d] occurred' or 'would occur' . . . [pursuant to 1.3(g) of the Master Agreement] and that all services would be performed 'in a safe, professional and workmanlike manner,' 'in strict accordance' with the Parties' contracts, and 'in accordance with generally acceptable professional industry standards' . . . [pursuant to § 18 of the Services Agreement]."  Therefore, Bransen's argument is based on both an unreasonable application of the contractual language and the facts clearly show otherwise.

Bransen argues that it offered adequate assurances to Dominion that it would perform in the future.  Those said assurances include, but are not limited to, the following:  "(i) buy back the entire coal stockpile for a purchase price of $27,000,000; (ii) replace the entire 600,000 ton stockpile with coal again meeting the specifications using independent test[ing] as provided in the agreements and sources approved by Dominion;" and (iii) be allowed to perform under the Services Agreement, at Dominion's direction.  ECF No. 26.  Bransen argues that its assurances met all the commercial standards requirements under Va. Code § 8.2-609(3).

> b.  Bransen's Motion for Partial Summary Judgment

Bransen begins its legal argument by asserting that it is entitled to summary judgment on its claims for three reasons:  that Dominion (1) accepted Bransen's product; (2) did not reject Bransen's product in a timely manner; and (3) failed to provide Bransen with adequate assurance of performance.  ECF No. 34 at 11.  Bransen addresses the first two of these arguments but fails to address the third, instead arguing that Bransen provided Dominion with such assurance.  Briefly, Bransen concludes by arguing that Dominion failed to comply with an alleged minimum-purchase obligation in the Post-COD Confirmations.

As to the first and second arguments Bransen sets forth, Bransen relies on the UCC to argue that Dominion accepted Bransen's product, entirely omitting any discussion of the rejection provisions expressly included in the contracts between the Parties.  *Id.* at 11-12 (citing Va. Code § 8.2-602 and -606).  Specifically, Bransen relies on the principle that "[a]cceptance of goods occurs when the buyer . . . fails to make an effective rejection, but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them.  Bransen argues that Dominion  took the coal delivered by Bransen and – despite having more than two and one half years to inspect the goods, after delivery and taking title and ownership – put the coal to use in its operations.  Say Bransen, this can be considered nothing *but* acceptance under the UCC.  *Id.* at 12 (citing  *Xpander Pak, Inc. v. Bostroem U.S.A., Inc.*, 1997 U.S. Dist. LEXIS 22536 at *31-32 (E.D. Va. Jul. 31, 1997)); *United States ex rel. Whitaker's, Inc. v. C.B.C. Enterprises, Inc.*, 820 F.

Supp. 242 (E.D. Va. 1993) ("By taking possession of the cabinets, cutting them to fit over pipes and installing the units, [defendant] accepted the cabinets within the meaning of the UCC."). Bransen underscores, "Not until June 30, 2014, did DVP [Dominion] even attempt to declare a default under the various agreements including the Pre-COD Confirmation.  Such an untimely attempt can in no way be considered 'reasonable' within the contemplation of Virginia law and the UCC."  *Id.* at 12.

Next, in arguing that Bransen provided Dominion adequate assurance of performance, Bransen relies exclusively on Va. Code § 8.2-609.  *See id.* 12-13.  Here, Bransen claims that it provided adequate assurance (1) as to the Pre-COD Confirmation, by offering to buy back or replace the entire stockpile; (2) as to the Services Agreement, by offering to perform under Dominion's direction; and (3) as to the Post-COD Confirmations, by offering to deliver one (1) million tons of coal in 2013.  *Id.* at 12.

As to the final argument, Bransen argues that it had an obligation to deliver, and Dominion had a duty to order, three million tons of waste coal under the two Post-COD Confirmations.  Bransen devotes one short paragraph to claiming that Dominion  "had a duty to order . . . three million tons of waste coal under the two Post-COD Confirmations."  In support, Bransen points solely to the statement in those contracts that "DVP [Dominion] shall submit weekly order to Seller [Bransen]."  ECF No. 34 at 13.

In response, Dominion begins its argument by claiming there is no genuine dispute that it properly rejected Bransen's product.  To support its position, Dominion turns to Va. Code § 8.1A-302, which establishes a foundational principle of Virginia contract law—that is, "the effect of provisions of the [UCC] may be varied by agreement."  ECF No. 39 at 20.  Dominion argues that the Parties varied the UCC's acceptance and rejection provision by agreeing that Dominion could arrange to test any ready pile prepared for delivery to VCHEC, per the Pre-COD Confirmation, and reject any ready pile that failed to meet specifications or was otherwise unsuitable for use at VCHEC, per the Services Agreement.  Say Dominion, it did indeed reject

Bransen's proffered ready piles following independent laboratory analysis, which revealed the presence of coke breeze.  *Id.* at 21.  In any event, Dominion asserts, Bransen intentionally prevented Dominion from "ha[ving] a reasonable opportunity to inspect [the goods]" by intermingling the coke breeze with coal on the stock.  Dominion argues that once it "finally learned of the possibility that coke breeze was present in the stockpile, it quickly alerted Bransen to the issue, diligently investigated the allegations, and, upon confirming that Bransen could not create coke-breeze-free ready piles, immediately rejected all the ready piles as nonconforming piles."  *Id.*

Additionally, Dominion argues that it is irrelevant whether or not Bransen provided Dominion adequate assurance of performance.  *Id.* at 22.  Because Bransen fails to point to any facts demonstrating that Dominion demanded assurance, Dominion argues it is legally irrelevant whether Bransen provided such assurance.  Furthermore, Dominion argues that Bransen committed numerous material breaches long before Bransen offered any of the alleged assurance to which it now points.  *Id.* at 23.  As such, Dominion argues that it acted well within its rights by terminating the contracts.  In any event, Dominion argues, Bransen failed to provide any adequate, commercially reasonable assurance of performance.  According to Dominion, any offers made by Bransen contemplated transactions *after* VCHEC's July 2012 COD and thus could not have served as assurance of performance under the Pre-COD Confirmation, the whole purpose of which, Dominion argues, was for Dominion to attain performance fuel for pre-COD performance testing.  *Id.* at 24.  Likewise, Dominion then argues that Bransen fails to assert that its offers of performance were adequate or timely with respect to the Services Agreement or Post-COD Confirmations.

Dominion then argues that the Post-Confirmations imposed no minimum purchase or weekly order obligation.  Dominion claims that the express minimum-purchase obligation that is present in the Pre-COD Confirmation was intentionally omitted from the Post-COD Confirmations because of the possibility that experiences during performance testing could

inform Dominion's evolving understanding of its post-COD needs.  *Id.* at 26.  In any case, Dominion argues that Bransen's claims are precluded by the first-material breach doctrine. Dominion claims that Bransen does not and cannot allege that Dominion ran afoul of any contract before Bransen itself committed multiple breaches.  *Id.* at 26.  Therefore, Dominion argues, the first-material breach doctrine long excused Dominion from any alleged contractual obligations that Bransen claims Dominion failed to perform.  *Id.* at 28-29.

Finally, Dominion argues that Bransen's claims are precluded by its failure to allege any recoverable damages and its failure to mitigate damages.  *Id.* at 29.  According to Dominion, Bransen completely fails to proffer evidence that it has suffered any recoverable damages under the terms of the Parties' contracts or mitigated any claimed damages, even if those damages were recoverable.  *Id.*

## V.   ANALYSIS

### a.  Whether Bransen's Delivery of Coke Breeze Was Antithetical to Its Contractual Obligations

At issue is whether there is a genuine dispute of material fact regarding whether the delivery of coke breeze by Bransen[10] to the Leased Property was improper and thus a breach of contract.  Although it admits that it delivered "approximately 43,000 tons" of coke breeze to the stockpile for which Dominion paid, *see* ECF No. 34 ¶ 12; *see id.* at 12, Bransen repeatedly asserts that the coke breeze "met the requisite quality specifications as set forth in the Pre-COD Confirmation," *id.* ¶ 17; *see also id.* ¶¶ 10, 20.  As a preliminary matter, within the Pre-COD Confirmation, "Run-of-Mine Coal" is marked with an "X," indicating that that is the product to be delivered; further, attached after "Run-of-Mine Coal" are certain specifications.  Bransen's

---

[10] The Parties set forth lengthy arguments concerning whether Bransen used the coke breeze merely as a base layer or, alternatively, mixed it with coal to deceive Dominion.  Whether the coke breeze was used as a base layer (or for any other purpose) is immaterial, here, because Bransen's acts of simply delivering and charging Dominion for that product breached the Parties' agreements. Further, the coke breeze that Bransen delivered was produced at an industrial facility owned by Jewell Coal and Coke Co. which, as Bransen has conceded, was not an approved source under the Pre-COD Confirmation.  *See* ECF No. 29 (Ex. 18 "Peters Interview"); *id.* Ex. 15 ("Bransen Dep.") 121:9-18).  A complete review of the Pre-COD Confirmation leaves no doubt that all product was required to come from an approved source.  *Id.* (Ex. 5 ("Pre-COD Confirmation")).

assertions are belied by the evidence set forth in the instant matter.  In fact, Bransen's owner and president, would not have previously said—*after* the coke breeze had been delivered and invoiced to Dominion—that he was "a lil [sic] nervous about Dominion not approving."  ECF No. 29 (Ex. 19 ("Email From Peters to Brown (May 5, 2011,))).  Nor would he have said that he was "embarrassed" about what had happened, that he "did not request nor receive permission from Dominion to purchase and bill Dominion for the purchase of the coke breeze under the terms of the agreement," that he "accept[ed] full responsibility for having improperly charged Dominion for the coke breeze," and that he "realize[d]" that he would "not be able to meet the delivery requirements without purchasing additional coal at his cost."  ECF No. 29 (Ex. 18 "Peters Interview").  Further, Peters lamented:

> It has always been [my] intention to deliver to Dominion the quantity of coal called for under the contract at the contract specifications, which he has always known would require the purchase of additional coal for which Dominion would not pay him.

*Id.*  From this admission, one can reasonably conclude that coke breeze did not fit the contractual specifications and, thus, fell outside the bounds of the contractual specifications.  In other words, one can deduce that what was delivered—coke breeze—was not what was expected—"Run-of Mine Coal," the product to which the Pre-COD Confirmation's specified.  Similarly, Peters described coke breeze as an alternative to "gravel" and as "more porous," *id.*, than Run-of-Mine Coal, thus imparting it "superior drainage capabilities," *id.* (Ex. 17 ("Peters Affidavit") ¶ 17).  Bransen primarily relies on the affidavit of Peters for the proposition that coke breeze "met the performance fuel specifications."  *Id.*  Such an allegation is conclusory and, in any case, the statements contained in his affidavit are undermined by his admissions contained elsewhere.  Thus, coke breeze is not Run-of-Mine Coal and therefore could not have met the specifications in the Pre-COD Confirmation.  It is very clear to this Court that there is no genuine issue of material fact regarding whether coke breeze was improperly delivered and thus placed Bransen in breach of contract.

### b.  Whether Dominion Accepted or Rejected Bransen's Product

As a preliminary matter, all of Bransen's counterclaims are barred by the first-material-breach doctrine, which provides that where one party has "committed a material breach[] . . . that party cannot enforce the contract," such that the other "is excused from performing his contractual obligations."  *Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997); *see also id.* ("A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract.").  Bransen cannot allege that Dominion ran afoul of any contract before Bransen itself committed a material breach—that being, the unauthorized delivery of coke breeze.  Nevertheless, the Court will still engage in an analysis of Bransen's arguments.

Bransen argues that Dominion failed to properly and timely reject the shipments that Dominion claims were unsuitable.  Bransen argues that pursuant to Va. Code § 8.2-606, Dominion is deemed to have accepted the product shipments if it either fails to make an effective rejection after a reasonable opportunity to inspect, or if it does any act inconsistent with Bransen's ownership.  ECF No. 34 at 11 (citing Va. Code § 8.2-606(b) and (c)).  This Court disagrees.  There is no genuine issue of material fact regarding whether Dominion properly rejected Bransen's unauthorized shipments of coke breeze.

Virginia law is clear that "the effect of provisions of the [UCC] may be varied by agreement."  Va. Code Ann. § 8.1A-302(a).  As this Court has explained, § 8.1A-302 "affirmatively establishes that 'freedom of contract is a principle of the [UCC].'"  *Barnette v. Brook Rd., Inc.*, 457 F. Supp. 2d 647, 658 (E.D. Va. 2006) (quoting § 8.1A-302, cmt. 1).  This freedom applies to the acceptance and rejection of goods and any resulting waiver under § 8.2-605.  *See Hanwha Azdel, Inc. v. C & D Zodiac, Inc.*, Civ. A. No. 6:12-CV-00023, 2014 WL 2452892, at *5 (W.D. Va. June 2, 2014).  As to what constitutes an acceptance of goods, "acceptance of goods occurs when the buyer . . . fails to make an effective rejection [subsection

22

(1) of § 8.2-602], but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them." Va. Code § 8.2-606(1)(b).

Here, the Parties varied the UCC's acceptance and rejection provisions by agreeing to a specific framework for rejections rights. Specifically, they agreed that Dominion could arrange to test any ready pile prepared for delivery to VCHEC, ECF No. 29 (Ex. 5 ("Pre-COD Confirmation")) at Attachment 2 § II.A) and reject any ready pile that failed to meet specifications or was otherwise "unsuitable for use" at VCHEC, i*d.* (Ex. 9 ("Services Agreement") at § 3(b), (d)). After receiving the anonymous tip letter in mid-December indicating that Bransen had delivered substantial quantities of coke breeze to the stockpile on the Leased Property and had taken steps to hide that product from sight, Dominion investigated the allegations, s*ee id.* (Ex. 16 ("Workman Dep.") 29:8-40:15), and, as confirmed by Peters in a signed and verified summary of the February 15, 2012 interview, Dominion determined that the tip was accurate in this respect, *id.* (Ex. 18 "Peters Interview") (indicating, among other things, that "[n]o one from Dominion came to the [stockpile site]" during the delivery of coke breeze). Pursuant to the language of the contract, Dominion rejected Bransen's proffered ready piles following independent laboratory analyses[11] revealing the presence of coke breeze. Regardless of whether the coke breeze served as a base layer or was intermingled with the coal in the stockpile, Dominion could not have had a reasonable opportunity to inspect the product.[12] Indeed, once Dominion learned of the possibility of a breach—*i.e.*, the possibility that coke breeze was (improperly) present in the stockpile—Dominion alerted Bransen to the issue, investigated the allegations stemming from the tip letter, and, upon confirming that Bransen could not create coke-breeze free ready piles, immediately rejected all the ready piles as nonconforming.

---

[11] Although the Parties do not fully explain this issue, one can reasonably conclude that if testing had to be done, one could not distinguish the physical appearance of coke breeze from coal with the naked eye.

[12] Even if the Court were to conclude that Dominion accepted the product, which it does not, Dominion properly notified Bransen of the nonconformity of the goods within a reasonable time after Dominion discovered or should have discovered the defects. *See* Va. Code Ann. § 8.2-607(2).

### c. Adequate Assurance and Cure

Bransen alleges a several reasons why "[Dominion's] purported events of default are the result of [its] own actions," including that Bransen "made numerous attempts to obtain assurances of adequate performance,"[13] and that Dominion "refused Bransen access to the stockpile." Bransen argues that it voluntarily provided adequate assurance—or tried to cure any alleged defects—(1) as to the Pre-COD Confirmation, by offering to buy back or replace the entire stockpile; (2) as to the Services Agreement, by offering to perform under Dominion's direction; and (3) as to the Post-COD Confirmations, by offering to deliver one million tons of coal in 2013. ECF No. 34 at 12. Specifically, Bransen asserts that although it offered to replace or buy back the stockpile, Dominion "steadfastly refused" the offers. *Id.* ¶¶ 31-33. Bransen also claims that "it had financing in place for this transaction with the intent to sell the coal as house coal in Europe." *Id.* (citing *id.* Ex. 17 ("Peters Affidavit") ¶ 17).

These assurances by Bransen were not commercially reasonable and could never save the improper delivery of the coke breeze. Bransen's assertion that it secured financing is contradictory to Peters' own testimony, as is the suggestion that European buyers had been secured. ECF No. 39 at 16 (citing ECF No. 29 (Ex. 15 ("Bransen Dep.") 52:16-58:19 (describing potential, but uncommitted, buyers in Ireland and an unfunded potential investor)); *see* ECF No. 29 (Ex. 15 ("Bransen Dep.") 52:16-58:19) (describing an uncommitted but potential investor)); *see also* ECF No. 29 at 12 (citing Ex. 16 ("Workman Dep.") 44:22-45;7; Workman Decl. ¶¶ 9-10)).

After approximately two years of good-faith efforts by the Parties to resolve the instant matter without litigation, Dominion, via a July 21, 2014 written letter, formally declared the occurrence of Events of Default and material breaches under the Master Agreement, the Pre-COD Confirmation, the Post-COD Confirmations, and the Services Agreement, pursuant to the

---

[13] As for any claim by Bransen that it sought to obtain performance assurance from Dominion, the Master Agreement explicitly states that "[Dominion] shall not be required to provide Performance Assurance to the extent that an Event of Default or Potential Event of Default has occurred and is continuing with respect to [Bransen]." ECF No. 29 (Ex. 1. ("Master Agreement")).

default and notice requirements under Sections 8.1 and 9.3 of the Master Agreement, and Sections 11 and 30 of the Services Agreement. ECF No. 29 (Ex. 24 ("Letter from Dominion to Bransen")). Bransen failed to respond in any form to the July 21, 2014 letter. As such, Dominion formally terminated the Master Agreement, the Pre-COD Confirmation, and the Post-COD Confirmations on July 25, 2014. ECF No. 29 (Ex. 25 ("Second July Letter from Dominion to Bransen")). Likewise, after Bransen did not cure any breaches—or respond in any way— under the Services Agreement within thirty (30) calendar days, Dominion, by written letter dated September 5, 2014, formally terminated the contract. *Id.* (Ex 26 ("September Letter from Dominion to Bransen")).

Bransen argues that it was not afforded a vital opportunity to cure because the June 22, 2013 cease and desist letter, issued by Dominion, prohibited Bransen from accessing the Leased Property and performing any alleged cure attempts. ECF No. 34 ¶ 38; see ECF No. 29 (Ex. 27 ("Cease and Desist Letter")). Further, Bransen argues that it was in fact illegal for it to enter the Leased Property because, as of June 30, 2014, neither Bransen nor CTI were operators or controllers on the Leased Property, with Dominion having entered into a services agreement with Omega Holdings on June 24, 2013. ECF No. 40 at 8-9 (citing Ex. 16 "Omega Services Agreement").

But the fact remains that Dominion complied with the timing requirements of all applicable notice, termination, and cure provisions in 2014 when it notified Bransen of defaults and material breaches under the Master Agreement, the Pre-COD Confirmation, the Services Agreement, and the Post-COD Confirmations, and demanded a termination payment. And, the fact remains that Bransen never responded—regardless of whether it, in fact, was able to cure. Certainly, there may be a kerfuffle over Bransen's actual ability to cure (*i.e.*, whether it *did* secure financing, whether it *could have* accessed the Leased Property to cure the stockpile). But it cannot be disputed that Bransen made no attempt to cure during the time it was contractually allotted subsequent to Dominion issuing the July 21, 2014 written letter. Whether Dominion's

June 22, 2013 cease and desist letter impeded Bransen's opportunity to cure does not alter this conclusion.   Therefore, there is no genuine dispute as to a material fact in the context of cure attempts made after the delivery of coke breeze and the resulting breach of contract.

## VI.   CONCLUSION

For the aforementioned reasons, this Court will GRANT Dominion's Motion, ECF No. 28.  The direct damages that flow from the breach of the improper delivery of coke breeze are supportable in the amount of $1,957,325.00.   Accordingly, the Court will DENY Bransen's Motion, ECF No. 33 and any amount of damages requested therein.

Let the Clerk send a copy of this Memorandum Order to all counsel of record.

It is SO ORDERED.

_____/s/_____
James R. Spencer
Senior U. S. District Judge

ENTERED this ___30th_____ day of April 2015.