IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**Richmond Division**

VIRGINIA ELECTRIC AND
POWER COMPANY,

*Plaintiff*,

v.                                                  Civil Case No. 3:14-cv-538

BRANSEN ENERGY, INC.

*Defendant*.

## OPINION

Bransen Energy, Inc. ("Bransen") contracted with Virginia Electric and Power Company d/b/a Dominion Virginia Power ("Dominion") to provide coal for Dominion's newly constructed Virginia City Hybrid Energy Center ("VCHEC"). The sales agreements required that the coal meet specific standards necessary to test and open the new power plant; Bransen provided non-conforming coal. Dominion could not use the coal, rejected it, and suffered direct damages because of Bransen's breach. The Court will award Dominion damages of $20,936,688.

## I. PROCEEDINGS

Dominion has sued Bransen for two breaches of contract. In its first claim, Dominion contends that in one phase of the transaction, Bransen provided "coke breeze" instead of "run-of-mine" coal. The Court granted summary judgment to Dominion on the coke breeze claim, and awarded Dominion $1,957,325.00 in damages.

Second, Dominion says that Bransen's remaining coal, while not coke breeze, nevertheless did not meet the contractually mandated quality standards. The parties tried the second claim to the Court, and this opinion contains the Court's rulings from the trial.

## II. FINDINGS OF FACT

The VCHEC is a new, environmentally friendly, and technologically sophisticated power plant. Before Dominion could bring the plant on line, it had to conduct tests, not only to make sure all the equipment worked, but also to satisfy various environmental permits issued by the Commonwealth of Virginia. Dominion contracted with Bransen to provide "performance" fuel—coal that met higher than normal standards for power plants.

Dominion entered four contracts related to the test and start-up phase of the plant—three of the agreements were with Bransen. First, Bransen and Dominion entered into a Master Coal Purchase and Sale Agreement ("the Master Agreement"). The Master Agreement governs all of the parties' subsequent transactions. It defines coal as "any and all of the Coal to be sold by [Bransen] and purchased by [Dominion], the quality of which conforms to the Specifications and which does not trigger [Dominion's] rejection rights under Section 5.2, or is otherwise accepted by [Dominion] … [and] is substantially free from extraneous materials." (Am. Compl. Ex. 2 at 36.) Section 5.2 states that "[Dominion] shall have the option, exercisable by notice to [Bransen] within two Business Days of [Dominion's] receipt of Proximate Analysis" to decline the shipment. (*Id.* at 12.) The provision adds that if Dominion does not give notice in two business days, it only loses rejection rights as to that particular shipment.

The "specifications" under the Master Agreement mean "the quality characteristics for the Coal … on an as received basis, using ASTM [American Society for Testing and Materials] standards, specified in…the relevant Confirmation." (*Id.* at 33, internal quotations omitted.) As used by the parties in this case, a "confirmation" is the equivalent of a purchase order.

2

Confirmations set forth specifications for the water content, size, extraneous materials, and British Thermal Unit per pound ("BTU per lb").[1]

After the Master Agreement, the parties entered into a confirmation for the purchase of performance fuel (the "Pre-COD Confirmation"). Dominion agreed to purchase 450,000 tons of "run-of-mine" coal with an option to buy 150,000 more tons subject to Dominion's specifications on the quality of the coal. (Am. Compl. Ex. 3.) Although "run-of-mine" coal sounds like some sort of middling product, Dominion imposed stringent requirements for the "performance fuel" testing of the plant. The Pre-COD Confirmation defines run-of-mine coal as "any and all of the coal to be sold by [Bransen] and purchased by [Dominion], the quality of which conforms to the Specifications set forth herein and which does not trigger [Dominion's] rejection rights and which may contain limited amounts of extraneous material." (*Id.* at 2.) It also specifies that Dominion has the right to reject the product if the coal does not meet the quality thresholds.

Third, Dominion entered into a Land Lease Agreement ("Lease Agreement") with Coal Technology International, LLC ("CTI"), to lease property on which Dominion would stockpile the coal from Bransen before delivering it to the VCHEC. Although Bransen is not a party to the Land Lease Agreement, Dominion and CTI expressly intertwined the Lease Agreement with the other contracts between Bransen and Dominion. The Lease Agreement would automatically terminate upon the expiration or termination of any pending Pre or Post-COD Confirmations or the Services Agreement. The Lease Agreement says that any coal remaining on the property after a post-termination removal period is deemed abandoned.

---

[1] BTU per lb measures the energy content in coal and other fuels.

On the same day as the Pre-COD Confirmation, Bransen and Dominion entered into a Coal Services Agreement ("Services Agreement"). The Services Agreement governed the management and handling of the coal that Bransen delivered to Dominion, and required Bransen to provide a number of services, including sampling the product to make sure that it met the required specifications before Dominion transported it to the VCHEC. At Dominion's request, Bransen would move a portion of the coal at the leased property to a "ready pile" so that Dominion could transport that coal to the VCHEC. Dominion had the right to reject any ready pile if it did not conform to the specifications defined in the Pre-COD Confirmation. To eliminate any doubt about the importance of meeting the specifications, the Services Agreement included the same specifications as the Pre-COD Confirmation. Viewed collectively, the contracts allowed Dominion to test any ready pile that Bransen produced and reject any ready pile that did not meet the specifications. In addition, the Services Agreement included express warranties that Bransen would provide services in a safe, professional, workmanlike manner and in accordance with the parties' contract and industry standards.

After Bransen began shipping coal to Dominion, the parties entered into two additional confirmations for the purchase of coal after the VCHEC started operation ("Post-COD Confirmations"). Under these agreements, Dominion intended to purchase up to three million tons of "waste coal"[2] from Bransen, with each confirmation having different quality specifications and price. Apparently, Dominion never ordered any coal from Bransen after the testing and start-up period.

Bransen delivered the product to Dominion at the leased property from February through December 2011, and Dominion paid for all the product delivered during that time. *Va. Elec. &*

---

[2] Waste coal can contain significant amounts of extraneous material which differentiates it from run-of-mine coal.

4

*Power Co. v. Bransen Energy, Inc.*, No. 3:14-cv-538, 2015 WL 2061983, at *7.  In mid-December, Dominion received a tip that Bransen had provided coke breeze,[3] product which Dominion could not process at the VCHEC.  *Id.*  After confirming that the product from Bransen contained coke breeze, Dominion retained an independent testing company to examine the coal in five ready piles.  Tests occurred on two piles in January 2012 and on three piles in April 2013.  Each of the piles failed to meet one or more of the contractual specifications for moisture and BTUs.  In addition, the piles contained coal that violated the size specifications of the contract by being too fine.  After testing the ready piles, Dominion did not request more ready piles from Bransen.

The failure to meet the specifications meant that Dominion could not use the coal to test the VCHEC.  Because the coal did not meet the specifications, Dominion rejected the ready piles.

The production of non-conforming coal did not end the story.  After concluding that the Bransen coal was a lost cause, Dominion took steps to cover its losses and to make the best of a bad situation.  An expert witness, Guy Davis, testified about Dominion's costs to remedy the breach, and the Court finds his testimony credible and accurate.

Dominion tried to use some of the Bransen coal.  To do so, however, Dominion had to process the coal to improve its quality.  To improve the coal, Dominion had to employ Harold Keene Service Co, LLC ("Omega") to screen the coal, Alpha Natural Resources to wash the coal, and Power Fuels, LLC ("Power Fuels") to process the coal; these services cost $10,681,425.

---

[3] Coke breeze is an inferior product of the mining process.

Because Dominion found itself with thousands of tons of non-conforming coal, it had to continue to store it, and so it incurred extra costs on the lease of the storage site. Dominion spent an additional $787,000 for losses incurred due to the increased rent at the leased site and $1,107,279 for the extended time that Omega had to maintain the stockpile under the most recent lease agreement.

Even with these efforts, Dominion had to buy additional coal from other mines to make up for the shortfall. Dominion's losses from replacing unusable coal were $10,318,309.

All told, Dominion's cost in curing the Bransen default totaled $22,894,013. Since the Court already awarded Dominion the damages and costs related to the coke breeze claim, the Court finds the remaining damages amount to be $20,936,688.

### III. CONCLUSIONS OF LAW

The contracts provide that Virginia law governs this dispute. According to Virginia law, the elements of a breach of contract action include (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. *Filak v. George*, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004). Dominion has proven each of the three elements.

#### A. *Legally Enforceable Obligation*

Bransen and Dominion entered into the Master Agreement, several confirmations, and Coal Services Agreement. The parties do not dispute that they entered into valid contracts with legally enforceable obligations between the parties.

#### B. *Breach of the Obligation*

The evidence clearly shows the second element of a contract action—breach by the defendant. Bransen produced coal which simply fell below the quality standards of the contract.

Bransen offers six arguments in attempts to skate around the breach. First, it says that the coal was really not really wet, but that recent rains had raised the apparent moisture level. Bransen's argument fails because the test coal came not only from the outside of the piles but also from the core—an area that the rain would not dampen.

Second, Bransen says that run-of-mine coal, the subject of the Pre-COD confirmation, is the same thing as waste coal. Credible expert testimony at trial refuted this claim; run-of-mine coal constitutes freshly mined coal whereas "waste coal is something that is left over after you have removed the good coal out of it." (Dk. No. 94 at 282.)

Third, Bransen argues that its own internal testing of the coal found that the coal met the specifications required by Dominion. (*Id.* at 250.) But the Services Agreement required that a third-party analyze the coal and that both parties accept the third party analysis "as final and binding upon the Parties for all purposes." (Am. Compl. Exhibit 5, 5.) The third party found that every sample failed to meet the quality standards in the contract, so Bransen's reliance on its own testing does not help the defendant.

Fourth, Bransen argues that Dominion did not correctly follow the termination procedure in the contracts. Bransen first argues that Dominion failed to properly reject the product. The parties varied their contract from the normal terms of the Uniform Commercial Code ("UCC") and allowed Dominion to test any ready pile prepared for delivery to VCHEC. This Court in its previous summary judgment opinion held that Dominion properly and timely rejected Bransen's shipments after independent laboratory analysis revealed that the product contained coke breeze. *Va. Elec. & Power Co.*, 2015 WL 2061983, at *22. Bransen contends that the Court limited its holding to only the coke breeze claims. Since the facts leading to the discovery of the coke breeze also led Dominion to continue its investigation and uncover the remaining non-

conforming coal, the Court's prior ruling applies to the non-conforming coal claim as well.  As noted in the summary judgment opinion, Dominion rejected each shipment but could not send a letter of default for the whole contract until 2014.  It could not send a letter of default because termination of the Coal Services Agreement or the Master Agreement would have also terminated the Lease Agreement, which Dominion needed because Bransen had stuck it with hundreds of thousands of tons of non-conforming coal.

Fifth, Bransen says that Dominion's continued utilization of the product shows that it never rejected the product.  As addressed above, Dominion did reject the product after independent testing found that it did not conform to the specifications.  After rejecting the coal, however, Dominion continued to use the coal as part of a mitigation plan to reduce its damages.[4] Mitigation of damages does not equal acceptance of the product.

Sixth, Bransen also argues that Dominion waived all warranties related to the quality of the coal except those specifically expressed in the contracts, so the coal it shipped did not breach the contract.  Regardless, the contracts expressly impose the requirements that Bransen failed to meet.

In sum, Bransen's ready pile of excuses does not change the fact that Bransen breached the contract.

### C. Damages

As a result of Bransen's breach, Dominion had to come up with a massive amount of coal for the start-up and testing of the plant.  Dominion incurred costs in processing and improving

---

[4]As noted in this Court's summary judgment opinion, these claims are also "barred by the first-material-breach doctrine." *Va. Elec. & Power Co.*, 2015 WL 2061983, at *22.  Bransen cannot claim that Dominion's failure to properly reject the goods occurred before Bransen committed a material breach, the delivery of non-conforming coal.  Consequently, the doctrine of first-material-breach would mandate that the Court deny these claims even if Bransen had a claim on the merits.

the Bransen coal, in storing the Bransen coal, and in purchasing coal from other suppliers.  Its total costs were $22,894,013.  All these damages stemmed directly from Bransen's breach, and Dominion is entitled to recover them.  This Court has already awarded judgment in the amount of $1,957,325 for the coke breeze claim, so the remaining damages, recoverable in this part of the proceeding, are $20,936,688.

## IV. CONCLUSION

After a bench trial, this Court FINDS that Bransen breached the Master Agreement, the Services Agreement, and the Pre-COD Confirmation by providing non-conforming coal.  This Court awards damages totaling $20,936,688 to Dominion.

An appropriate Final Order shall issue.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: February  11 , 2016
Richmond, Virginia

/s/
John A. Gibney, Jr.
United States District Judge